**ROBERTS et al. v. KENNA et al.**
No. 4680.

Court of Civil Appeals of Texas.
Beaumont.
May 17, 1951.

See also 198 S.W.2d 743.

O'Fiel & O'Fiel, Beaumont, for appellant.

682

Geo. M. Sonfield, John L. Bell, Beaumont, DeLange & Hudspeth, Houston, for appellee.

WALKER, Justice.

On March 3, 1946, the County Court of Jefferson County authorized the administrator of the estate of Frank K. Evans, deceased, to sell 9 tracts of land belonging to the estate. The sales were made by the administrator and were by him reported to the County Court on March 4th, and were confirmed by the County Court on March 10th. On that same day the administrator made deeds conveying the several tracts of land to the purchasers thereof.

Frank K. Evans was a Negro. He died in 1936, intestate, leaving an estate consisting of 22 tracts of land, appraised on November 20, 1937, at $71,580, and some items of personal property appraised at $228.50, the property, however, being subject to debts almost as great as the value of the estate. In 1936 or 1937, an administration was opened on Evans' estate which is still pending. Dowlen, the first administrator, was replaced in 1937 by the present administrator, whose appraisement we have just mentioned.

The proceeding in which the appeal before us was taken was in certiorari, to review and set aside the orders and the administrator's deeds mentioned. Plaintiffs are the decedent's heirs. The petition for certiorari named as defendants the administrator, his surety, the purchasers of the tracts sold, and some vendees of some of these purchasers. The trial court severed the proceeding against the purchasers Sanders, Broadus and Coffin from that against the other defendants, and those three defendants are not parties to this appeal and the properties which they bought are not involved in this branch of the proceeding.

That part of the proceeding which constitutes the subject matter of this appeal came on for trial before a jury who returned a verdict in behalf of defendants; and on this verdict the trial court rendered judgment against the plaintiffs. Two judgments, the same in words and figures, were actually pronounced and were actually recorded in the minutes of the trial court, the second judgment to cure a defect claimed by plaintiffs in the rendition in the first. From the last judgment plaintiffs have perfected this appeal.

Plaintiffs have filed 27 points of error for reversal. These points are numbered from 1 to 12, inclusive, and from 15 to 29, inclusive; there are no points numbered 13 and 14. These points will be discussed in an order different from that followed by the plaintiffs.

Point 1 assigns as error that the first judgment of the trial court is the only judgment of that court, the second judgment being a nullity, and that the first judgment should be set aside because it was not rendered at the place required by law. The cause was tried by a special judge who acted by virtue of an assignment by the presiding judge of the administrative district. The first judgment was signed by the special judge in his own district, outside of the limits of the district in which the cause was tried, and the special judge sent this judgment to the clerk of the trial court, who entered it on the trial court's minutes. Plaintiffs attacked this judgment in their motion for a new trial because the judgment had not been rendered at the place required by law, and because of this, the special judge returned to the bench of the trial court and pronounced the second judgment. Both judgments are the same, in words and figures.

Point 1 presents no ground of error available to plaintiffs and it may be overruled for that reason, without any expression of opinion concerning the effect of the second judgment. Plaintiffs did not perfect an appeal from the first judgment. This judgment recites that it was rendered on November 9, 1949, and the clerk has certified that it was filed on November 10th. Plaintiffs' original motion for new trial was not filed until November 21, 1949, so that it was not filed within 10 days after the judgment was rendered (counting from either November 9th or 10th). Sections (j), (k) and (l) of Texas Rules of Civil Procedure, rule 330 apply to the trial court and Section (k) required the original motion to be filed within 10 days after the judgment was ren-

dered. Plaintiffs filed an amended motion for new trial (leave to file is not shown in the transcript) on December 10th, but neither the original nor the amended motions were acted upon by the trial court. Under T.R. 306a, the date on which the judgment was rendered would seem to be November 9th, that being the date of rendition stated in the judgment, and if this conclusion is correct, the amended motion was filed on the 31st day after the judgment was rendered. According to Senter v. Shanafelt, Tex.Civ.App., 233 S.W.2d 202, the original motion for new trial was overruled by operation of law on the 30th day after the judgment was rendered; and the amended motion was too late. However, the date on which the amended motion was filed is without significance because the original motion was not filed within 10 days after rendition and the provisions of Sections (k) and (l) of T.R. 330 which extend the time for filing the appeal never came into operation. See: Independent Life Ins. Co. of America v. Work, 124 Tex. 281, 77 S.W.2d 1036; Dallas Storage & Warehouse Co. v. Taylor, 124 Tex. 315, 77 S.W.2d 1031; National Consolidated Bond Corp. v. Burks, 134 Tex. 236, 132 S.W.2d 851. These decisions construed Sections 28 and 29 of Article 2092 but apply to Sections (j), (k) and (l) of T.R. 330 because these sections of the Rule carried forward those statutes. Alexander Motor Co. v. Pruitt, Tex.Civ. App., 198 S.W.2d 947. And note: Forrest v. Beynon, Tex.Civ.App., 179 S.W.2d 355; DeLeon v. Texas Employers Ins. Ass'n, Tex.Civ.App., 159 S.W.2d 574. The result of these decisions is this: the amended motion, if filed within 30 days after the judgment was rendered, was either of no consequence whatever, as was the original motion, so far as extending the time for perfecting an appeal is concerned, and the time for appeal should be counted from the date of the judgment; or else, under Senter v. Shanafelt, the amended motion, if filed within 30 days after the judgment, was overruled by operation of law at the expiration of the 30th day after the judgment was rendered, and time for appeal should be counted from that 30th day. Thus, under T.R. 356, the latest possible date on which plaintiffs could file an appeal bond was either January 8 or 9, 1950. The plaintiffs, however, did not file their first appeal bond until January 17, 1950, and thus failed to perfect an appeal from the first judgment.

The consequence is that the first judgment is not subject to review on this appeal, and if it is the judgment of the trial court this appeal ought to be dismissed. We have not determined whether the first judgment or the second judgment of the trial court is the judgment which disposed of the case because this is not necessary and the defendants do not insist upon a determination of the question. Plaintiffs are in this position; either the first or the second judgment is the judgment in the cause. Under Bridgman v. Moore, 193 Tex. 250, 183 S.W.2d 705, the second judgment could be entered if, but only if, the first judgment was void. So, if the first judgment was void, the second is good but if the first is not void then plaintiffs had to attack it directly, and they have not perfected their appeal from it and thus did not bring it up for review.

Point 1 is accordingly overruled.

Points 2, 3 and 4 are disposed of by these comments, and are overruled.

Point 20 assigns as error that "the preponderance of the evidence" showed that no necessity for a sale existed. The trial court defined "necessity" as "a strong or urgent reason" for the thing done. In response to Issue 11, the jury found that the sale was necessary. We do not have authority to set aside a finding of a jury because it is contrary to a "preponderance" of the evidence; but the arguments made in support of Point 20 will be adjudicated on their merits. We have pretermitted any consideration of the question, whether Issue 11, involving as it does, the trial court's definition of necessity, is material to the judgment.

The Administrator's application for authority to sell, which was filed on February 19, 1947, recites that the sale was necessary "to pay the legal charges and claims, and particularly delinquent taxes owing the State of Texas, Jefferson County, and the

City of Beaumont." The exhibit attached to the application lists a judgment in behalf of the State against the Administrator for the delinquent State and County taxes, and stated that "the amount necessary to pay taxes is $16,885.38, plus interest from February 15, 1947," a date two days earlier than the filing of the application. The exhibit also listed State and County taxes for 1946 which amount to $613.69. Thus, the total indebtedness for State and County taxes listed was $17,499.07. No indebtedness for taxes levied by the City of Beaumont was listed in the exhibit; but the reference to such taxes made in the application must have been a reference to the municipal taxes listed in the last annual account, that for 1946, and the administrator's annual account for the calendar year 1946 listed as debts "taxes due the City of Beaumont for the years 1938–1946, incl.", amounting to $18,952.09. The City of Beaumont had filed suit to collect its taxes and this suit had been pending for a long time before the administrator applied for authority to sell. The administrator's lawyer testified that the officials of the City were insisting on payment of the taxes levied by the City and at first set February 15, 1947 as the latest date they would wait on payment before proceeding with attempts to collect these taxes by judicial proceedings. However, he persuaded the officials of the City to postpone action in the suit until the sales were made and the proceeds of the sales were collected; and a judgment was rendered in this suit on March 14, 1947, in behalf of the City against the administrator for $16,929.59. This judgment recites payment of this sum, and payment necessarily was made from the proceeds of the sales. The administrator's lawyer testified, too, that he had persuaded the City officials to agree to a reduction of their demand by about $3,000, and there is a difference of about $2,000 between the sum paid to the City and the indebtedness to the City listed in the account for 1946. This evidence, of course, shows a "necessity" for a sale in the sense which the trial court's definition gave that term; for a judgment in behalf of the City, if enforced, might ultimately have resulted in the lands of the estate, or practically all of said lands, being put up for sale at public auction and in addition, the administrator would have lost the substantial reduction of the taxes claimed which the City gave him. A judgment for $12,591.31, and for interest and costs, was rendered in behalf of the State against the administrator. This judgment was dated January 15, 1947, but it was filed and was entered on February 19, 1947, which was also the date when the administrator applied for authority to sell. This judgment foreclosed the tax lien. It also reduced the assessments on which the taxes sued for by the State had been levied, and thus gave to the administrator the benefit of a substantial reduction of the amount of taxes claimed in the suit by the State. This judgment covered all of the lands of the estate and if collected by judicial proceedings would ultimately have subjected the estate to the possibility of public sale and it was a circumstance to be considered by the jury in answering Special Issue 11, and by this court. This judgment was also paid from the proceeds of the sale.

Thus, as far as debts were concerned, debts for taxes totaling about $30,000 existed when the application to sell was filed. Plaintiffs do not deny that indebtedness for taxes collectible by the State and City existed, but expressly admit the existence at that time of indebtedness for such taxes. They do say (referring to allegations in their petition for certiorari and not to any proof on the matter) that the judgment for the taxes collectible by the State had not been put in the form of a claim; but the existence of *debts* being admitted, the probate court had power to consider the taxes in determining whether a sale was necessary, even though not put in the form of a claim. Heard v. Vineyard, Tex.Com.App., 212 S.W. 489, at page 492.

█ Plaintiffs make two arguments in support of Point 20. They say, first, that the debts because of which the sale was made could have been paid by monies on hand and by rentals collected from the properties of the estate within the space of a year, apparently the year 1947.

This argument assumes that the administrator is the equivalent of a trustee in equity, charged with operating the estate for the benefit of the heirs over a term of years instead of being a statutory agent of the probate court whose primary business it is to wind up the estate by paying the debts and distributing the property to the heirs as speedily as he properly can. See: Article 3320, R.S.1925.

■■ The argument also disregards the creditor's right to be paid by sale of real estate if his debt is due and if personalty is not in hand, available to pay him. Generally speaking, the personalty is the primary fund for the payment of debts, but the creditor whose claim is due cannot be required to wait for payment until personalty is reduced to possession, if real estate is available which can be sold to pay his claim. Brown v. Fleming, Tex.Com.App., 212 S.W. 483. The rentals proved by plaintiffs are those shown in the administrator's various accounts and these accounts (approved at least through December 31, 1944) show that in all probability several years would have been required to discharge the indebtedness for taxes. The argument, in fact, is not supported by the proof.

Nine of these reports by the administrators are in evidence, one by the first administrator Dowlen, and the other eight by his successor, Kenna, who made the sale. The reports of the administrator Kenna cover a period which seem to begin with a "fiscal year" ending with June 30, 1939, (the record is confusing here) and continues with accounts which begin with June 30, 1931 and ends with December 31, 1949. Those prior to January 1, 1947 are relevant at this point. These reports show that the only substantial income of the estate was rentals collected from the various properties, constituting the estate, and the reports show that while the rentals were large, the expenses incurred in operating the estate were also large. Of course, it was the net profits from these rentals, a sum much less than the total amount of the rentals collected, which would have constituted the fund to pay the taxes. An approximation of the time needed to pay the taxes from the net profit in rentals can be made by considering the time which was actually needed to pay Mrs. Bohrer's note. On June 30, 1939, the amount owed and unpaid on that note was $34,850, and this sum is about what was owing for taxes. The annual report, closing with December 31, 1946, seven and one-half years after June 30, 1939, showed that a balance of $2,328 of this note was still unpaid. The administrator's lawyer testified that this was paid in January, 1947. The administrator and the probate court could very well have assumed that the net profits in rentals would not have discharged the delinquent taxes for several years, at least three or four years subsequent to the time the sale was actually made in March, 1946. This conclusion that several years would be needed does not require all of the reports to support it; it could be drawn from the reports approved by the probate court and from the evidence concerning the condition of the properties at the time of sale.

Plaintiffs refer to the fact that the annual report for 1946 listed funds on hand on December 31, 1946 amounting to $11,-163.76; but the reports show this sum to have been four or five years in accumulating. Thus the surplus on hand on October 1, 1945, (the closing date of the account next prior to that closing on December 31, 1946) was $9,439; and the surplus on hand on December 31, 1944 (the closing date of the next prior report) was $7,680.15. This report, closing December 31, 1944, actually covered four years, 1941, 1942, 1943, and 1944, so that the closing date of the next preceding report was December 31, 1940; and on that date the surplus listed amounted to only $400. Thus the existence of this fund of $11,163.76 on December 31, 1946, does not prove that collection of rentals would have speedily paid the delinquent taxes; and we note that the administrator's exhibit, attached to his application for authority to sell, showed that most of this fund had been expended. The administrator listed only $2,590.45 on hand on February 17, 1947, not quite two months after the closing date of the report which listed $11,163.76. The administrator's lawyer testified to the payment of the balance owed

to Mrs. Bohrer and of an assessment for income taxes out of this $11,163.76 before the application was filed.

The taxing authorities were under no obligation to postpone the collection of the taxes until the net profits in rentals were sufficient to pay the taxes; and the administrator and the probate court were under no duty to attempt to persuade them to do so.

Plaintiffs' second argument in support of Point 20 is this, that the administrator could, and should, have procured a loan to pay the taxes, or procured some one to purchase the tax claims and thus have avoided a sale.

This argument, as did the first, assumes that the administrator is charged with the duties of a trustee. No proof is referred to by the parties showing that the administrator could have procured a loan except the proof concerning the proposal of Mr. H. L. Warren. This proposal was dated January 25, 1945, some eight months before the sale was made; but it was conditioned upon a certain form of security, namely, a deed of trust upon the entire estate. The administrator could not have made such a contract which would have been enforcible as a contract. Sherman v. El Paso National Bank, Tex.Civ.App., 100 S.W.2d 402; McMahan & Co. v. Harbert's Adm'rs, 35 Tex. 451; Price v. McIvre, 25 Tex. 769; Stevenson v. Roberts, 25 Tex.Civ.App. 577, 64 S.W. 230, at page 233; Gregory v. Leigh, 33 Tex. 813. These comments, of course, do not apply to a purchase of indebtedness of the estate. Loewenstein, Gdn., v. Watts, Adm., 134 Tex. 660; 137 S.W.2d 2, 128 A.L.R. 910; nor do these comments apply to equitable rights by way of subrogation, but subrogation would not have satisfied the conditions of Mr. Warren's proposal. Mr. Pool, who was Mr. Warren's lawyer, testified that he eventually advised Mr. Warren not to make the loan. Mr. Warren's testimony is not so explicit but we are considering the sufficiency of the proof to support a finding of fact.

The administrator would have obligated himself had he borrowed money to pay the debts. He was not required to do so under the state of authority apparent from the decisions just cited.

Plaintiffs have referred to a statute, which we assume to be Article 7345a, Vernon's Annotated Texas Statutes, in which provision is made for the purchase and transfer of indebtedness for taxes and of the liens securing the taxes, but this statute requires that the "owner" give written authority for this transfer to be made; and the ownership of the estate was actually uncertain, or at least appeared to be. One Ethel Melton claiming to be the wife of the decedent, was asserting a claim to an interest in the estate, and Mr. Pool testified that she refused to consent to such an arrangement. Ethel Melton's lawyer also testified, and said that he had refused to approve this arrangement. The administrator could not resolve this question of ownership so as to protect one purchasing the tax debt and lien at the request of plaintiffs and other heirs of the decedent, and under the circumstances was not bound to seek out some one who would disregard this question.

Further, a loan, direct or indirect, would only have operated to extend the time for the payment of debts due and unpaid and the extension of time must have extended over a period long enough for the net profits in rentals to pay the debts. This would have prolonged the administration several years. The administrator and the probate court, under the circumstances, were authorized to refuse to do this.

Finally, the plaintiffs could have done as much for themselves here as the administrator, and more, for they owned the properties. If a purchaser of the debts of the estate could have been secured, that relief was as available to them as to the administrator.

Point 20 is overruled.

Points 21 to 25, inclusive, assign as error that the evidence is "insufficient" to support the findings made by the jury in response to Issues 1, 3, 5, 7 and 9, respectively, of the trial court's charge. These five issues submitted the question, whether the properties involved in this proceeding were sold for a price "so grossly inadequate as to shock the conscience" as this phrase has

been defined in the charge. The trial court defined the court's phrase as follows: " * * * the term grossly inadequate price of such a nature as to shock the conscience means a price so disproportionate to the real value of the property as to cause the conscience or understanding or both, of a just man to be stunned, to tremble, or to instinctively cry out against it." The jury answered each issue "no".

As we construe these Points of Error, plaintiffs have invoked our jurisdiction to determine questions of fact.

 Points 21 to 25, inclusive, are overruled on the following grounds:

Several persons testified to the values of the several properties and their conclusions were in conflict. However, this testimony did no more than raise an issue of fact for the jury. Thus the witnesses Ellis, Lowry and Stevens, all of them engaged in the real estate business and purportedly familiar with the values of such properties, assessed much higher values than the prices for which the properties were sold, but Ellis had made his appraisal about a month before the trial began, and so had Stevens. Trial of this cause began on September 19, 1949, a few days more than two and one-half years after the properties were sold. Lowry had made his inspection only two days before the trial. None of these witnesses knew the condition of the properties at the time of the sale, although the witness Lowry did have some general information concerning the properties over a long period of time and when he made his inspection was in possession of information concerning the values of the properties. However, the testimony of these witnesses amounts to no more than a series of opinions based primarily upon the witnesses' knowledge of the values of properties over the years. The testimony of the witnesses Lindsey and Leach, whom defendants called to the stand, assessing values which were consistent with the sales prices, was of the same sort. As we read the record, the only witness (other than the purchasers) who was qualified to appraise the value of the property and who knew anything about the condition of the properties, when the sale was made was the appraiser Stone, whom the administrator employed to appraise all of the real property belonging to the estate as a step preliminary to making a sale. Stone made his appraisal during December, 1946 and the first part of January, 1947, and stated his conclusions and the data on which these conclusions were based, in an extended and detailed written report which is in evidence. This report, made to the administrator, was dated January 16, 1947. It apparently came into the hands of the administrator's lawyer about that date and it was used in determining what properties should be sold and what bids for the properties should be accepted. It is enough to say of the appraisal and of the appraiser's testimony that it supports the sales prices. Of the nine tracts sold, only one was sold for less than the appraised value and that was the tract sold to Coffin for $500. This tract was appraised at $650 and the administrator's lawyer testified in effect that it was added to the properties selected to be sold because it was not improved and it would add to the prices which would be obtained just about enough to pay the sum which the administrator expected to pay.

Plaintiffs have attacked the appraiser's qualifications to form an opinion concerning the values of the properties, but he was as well qualified an expert as were those called by the plaintiffs, and he did have the benefit of a knowledge concerning the condition of the properties at the time in question which the witnesses called by plaintiffs did not have. The heavy expenditures which defendants' testimony shows were made on the tract purchased by Serafino and the two tracts purchased by Jef Chaison Townsite Company support the accuracy of his observation.

Tract 1 (appraiser's tract 7; Stone appraised 22 tracts) was bought by Dr. Serafino. Stone appraised the land at $1,500 and the improvements at $6,500, a total of $8,000, and Dr. Serafino paid $10,101. The only improvement on this tract of any substantial value was the brick building. The other improvements were three Negro tenant houses, each of three rooms, referred to as "sharpshooters"; and the evidence of the appraiser and the purchaser showed

that these were in bad condition. The purchaser said that he had disposed of them, and the proof showed that they had been removed from the tract. There was ample proof, from the appraiser and from the witness W. K. Sherman, that the brick building was in exceedingly bad condition when it was sold. The testimony of Dr. Serafino and that of W. K. Sherman, who made the repairs, shows that after the sale, Dr. Serafino had to repair the building and did so at an expense of about $7,000, approximately two-thirds of the purchase price. These repairs were begun after the purchase and it is to be inferred, were completed as soon as the occupants would permit. The permits issued by the City of Beaumont were dated March 31 and May 12, 1947. If there is any inconsistency in the proof as to whether all of the repairs testified to by the purchaser and Mr. Sherman, were actually made this was an issue of fact for the jury. Dr. Serafino had rented his building, most of it to one Long on May 9, 1947, two months after his purchase, and subsequently, another part to Carter, and prior to the trial had collected $10,180 in rentals; but the jury were authorized to infer that the extensive repairs were a material cause of these rentals. Thus, on cross examination this purchaser testified: "Q. And after you made these repairs you had a month rental of $325 a month off the building? A. Yes." The extensive repairs, too, would doubtless be a material cause of any increase in values after the sale.

Tracts 2 and 3 (appraiser's tracts 6 and 3, respectively) were bought by H. G. Morris. Stone's report described the improvements on tract 2 as follows: "Three 4-room frame houses, very old, very bad roofs, no paint, outside toilets." He appraised the land at $500 and the improvements at $900, the total being $1,400. Morris paid $2,500. Stone's report described the improvements on tract 3 as being four houses. Two were "6-room houses better than most others, needs roof and paid. Outside toilets." Two were "4-room frame houses, bad roof, no paint, outside tiolets." He appraised the land at $1,000 and the improvements at $1,900, the total being $2,800. Morris paid

$2,800 for this tract. Thus, for the two tracts on which stood seven houses, Morris paid $5,300, and this payment was made in cash. The proof shows that Morris had sold or made contracts to sell all of this property and that he had dealt with each house as a separate unit. The sales prices totaled $9,400, thus giving him an apparent profit of $3,900 on an investment of $5,300. All of these. contracts, except one made in June, 1949, were made within a space of three or four months after the date of sale; and at least four of the purchasers were Negroes. The property was in a Negro residential area.

However, only one of Morris' sales had actually been completed by the payment of the sales price; he had sold one of the houses for $1,850. The other six sales were evidenced by executory contracts. Under five of these contracts the purchasers had made relatively small payments when the contracts were made and under one of them no such payment was required. Each of the six contracts required the purchaser to pay the balance of the price in small installments over a period of years. Thus, on these six executory contracts, a payment down of $100 had been made on four, $200 on one and, as stated, none at all on one contract, or a total of $600. Under four of these contracts the monthly installment was $25, under one $20, and under one $47. One of the contracts would have run for two years and eight months if payments were made according to its terms; the others would have run for three years or longer. The proof does not show how much money Morris had been paid under these contracts. The significance of Morris' method of selling his properties is as follows: (1) There was some evidence pro and con as to whether a subdivision of the two tracts and a sale of the separate units. thus made would produce a larger total sales price than would a sale of each tract without subdivision, as had been made to Morris; (2) Lindsey, who had been engaged in the real estate business and had acted as a government agent in fixing rental limits, thought that a much better price could be obtained from Negro purchasers. if sale were made on credit instead of for

cash; (3) Morris had made one executory contract of sale which the purchaser had abandoned. This indicates the existence of some hazard attending a sale by executory contract. (4) Another fact to be considered which we have not mentioned is this; in at least five of his executory contracts (the possible exception is one for $1,250) the part of the price to be paid in installments included the interest charged. The proof does not show how much interest was charged. Under all of these circumstances, it seems to us that it ought not to be said that Morris bought his properties at an unfair price.

Tracts 4 and 5 (the appraiser's tracts 9 and 10) were sold to the Jef Chaison Townsite Company. Each tract consisted of three ordinary city lots and each was 150 feet by 140 feet in size. There were 12 houses on tract 4, and 13 houses on tract 5. The appraiser's report described the improvements on tract 4 as follows:

"1201-03-05-07 Cedar—Four room frame sharpshooters in bad shape, no paint, bad roof, outside toilets.

"202-04-06-08-10-20 Victoria—Four room frame sharpshooters in bad shape, no paint, bad roof, outside toilets.

"1208-10 Cement Alley—Frame duplex in terrible condition, bad roof, no paint and outside toilet."

He described the improvements on tract 5 as follows:

"201-203-03½-05-07-08-11 Victoria—Houses in deplorable condition.

"1120-28 Cement Alley—Barely standing. —This is the worst property in the entire Estate and should be condemned. Income sure to cease soon."

The testimony of Russell, an officer of the Townsite Company, supports the appraiser's description. The appraiser assessed the value of tract 4 at $4,000 and the value of tract 5 at $3,400. The Townsite Company paid $5,110 in cash for tract 4 and paid $5,010 in cash for tract 5.

However, the testimony of Russell shows that after the sale to the Townsite Company, this purchaser had expended about $7,500 in repairing the improvements on these two tracts. Of this sum, about $7,000

had been capitalized under the income tax law, that is, classified as an investment of capital, while only some $300 or $400 had been reported as an item of expense. Thus, this purchaser, as had Serafina, had made expenditures on repairs amounting to about two-thirds of the price paid for the tracts bought. The proof does not show what part of these expenditures or repairs was made on tract 4 and what part was made on tract 5, although, as hereinafter stated, Mr. Weed, who bought tract 5 from the Townsite Company, estimated the repairs made on tract 5 as amounting to about $2,500.

The Townsite Company kept tract 4 but eventually sold tract 5 to W. F. Weed for $15,000. Weed, or rather his associate T. E. Moor, who acted for himself and Mr. Weed, had bid $3,025 for this property at the time that the Townsite Company had made bids for it, although Weed also testified that he thought $5,000 was a fair market value at that time. The price paid by Mr. Weed to the Townsite Company was almost three times as much as the sum paid by the Townsite Company for the tract but in determining the significance to be given this increase in price the following factors must be considered. (1) The apparent profit includes the repairs made by the purchaser. As we have stated, this item was not definitely proved, but Mr. Weed estimated it at $2,500, which shows, at least, that extensive repairs had actually been made to the improvements on this tract. Weed had reason and opportunity to know, for his place of business was on an adjoining tract, and he was, as stated, the purchaser from the Townsite Company and he included his estimate of the repairs in the offer he made to the Townsite Company. This offer was $7,500. (2) Further, the conveyance to Weed was dated September 8, 1948, almost 18 months after the sale was made on March 4, 1947, and was confirmed on March 10th. (3) Finally, Weed's purchase of tract 5 and the price he paid were materially influenced by circumstances other than the market value which the property had as Negro rental property, the purpose for which it was sold to and bought by the Townsite Company and for which it was used by the

Townsite Company during the 18 months the company owned the property. Weed was engaged in the business of fabricating buildings of steel, and his office, warehouse and shop were on a tract adjoining tract 5. There was testimony from Russell that the operations of Weed's business tended to lessen the potential value of tract 5. Thus Russell, an officer of the company, testified: "Q. Were there any special circumstances in connection with that sale? A. Well, he wanted to put some business on there that I thought would damage our adjoining property which we had. What he had there at the time was damaging it." He testified further: "Q. Cement Alley. And did you say something about Mr. Weed's property, that that business he was running there was damaging your property in some way. How was it? A. I think that if things ever get hard to rent, we will have to reduce the rents along in there, because of the noise." In addition to this factor Weed's business had grown and he needed more space, particularly for storage, and there was an immediate need for more storage space when he bought the property. The Townsite Company knew these facts. Thus, Russell testified:

"Q. Did he already have adjoining property of his own? A. Yes, he owned that adjoining.

"Q. You know he had a special need of this particular tract you sold him? A. Yes. He wanted to expand his prefab business.

"Q. Did he have any other place to expand? A. I didn't think he did."

Further:

"Q. What use is he making of the property he bought? A. He has filled it in and is putting just the steel out there.

"Q. Did you know he had a special car of steel coming at the time he bought it? A. Yes. He had something rolling and he needed a place to put it.

"Q. You had information as to his general need at the time you fixed the price at as much as you did, didn't you? * * *

"Q. Did you have knowledge of his need for the space for expansion at the time you

sold to him? A. Yes. They told me they did. They told me they needed the room.

"Q. In other words, at the time the sale was made, Mr. Weed needed the space, and you knew of his need for the property; is that right? A. That's right."

Weed himself testified:

"* * * However, in 1948, business expanded, and we were offered the opportunity to buy steel at a discount and I needed additional space to put the steel on. I conferred with the people about buying the property next to a piece of property Mr. Moor and I owned, or going out and purchasing a larger tract sufficient to move my entire operations. We tried to buy my property for considerably less than I finally paid, and were unable to make the purchase, but we finally decided it would be best for my business and the company to pay $15,000 for this piece of property.

"Q. Did you think it was of that value when you paid it? A. What?

"Q. Did you consider that was a fair market value, or a special value to you? A. Well, I think I paid more than it was worth.

"Q. At the time you felt its fair market value to be about what? A. Well, I knew that the Chaison Townsite Company had put some new roof on most of the buildings, and I could estimate the cost of that at around $2,500, and I believe my first offer for the property was $7,500, which I considered fair market value at that time."

Weed's testimony also shows that in determining whether to buy the property he and his associate considered the expense which they would have to undergo if they moved their property. Thus, Weed testified:

"A. It was suitably located. A suitably located place, I don't believe I could, because we thought—Mr. Moor and I thought, agreed it would be to our better interest to build on this location than seek a location elsewhere, inasmuch as we have rail service. We wouldn't have at any other location we might move on.

"Q. I see. A. We investigated several other sites and found them less satisfactory than this."

Further:

"Q. And you didn't think when you paid $15,000 for the property you were getting value for it; therefore you just went ahead and got it? A. No. I believe I said I figured it was cheaper to acquire that property than abandon my space where the prefab was there and replace them.

"Q. With that calculation in mind, you figured it was worth $15,000 and you gave it? A. Yes, exactly."

The jury were authorized to assume that all of these matters were causes of Weed's paying such a high price for the property when he thought it was actually not worth that much and although he had first offered the Townsite Company only $7,500. (4) We have referred to the fact that the property was sold to the Townsite Company and was operated by the Townsite Company for Negro rental property. Weed bought the property for industrial use. This difference in purpose may reasonably be thought to have affected the value of the property to Weed. The proof shows that Weed had actually removed several of the Negro houses on tract 5, (six, according to Reed Roberts) and was using the space thus made vacant for the purposes of his business. It seems to us that when consideration is given to the long period of time between the Townsite Company's purchase of tract 5 and its sale of tract 5 to Weed, the heavy expenditure for repairs, testified to by Russell, the opinion of Russell that Weed's operations were a potential source of injury to the property, Weed's need for space, and the fact that the Townsite Company bought the property for one purpose and sold it for another, it cannot be said that the price paid by the Townsite Company was unfair.

There may be some conflict in the proof as to whether the repairs mentioned above were all made, but any issue of fact here was for the jury.

It is our conclusion that the findings of the jury attacked by Points 21 to 25, inclusive, are supported by the evidence.

■■■■ Point 16 assigns as error that the property was sold at private sale and this procedure violated Article 3570, R.S. 1925, which, plaintiffs say, required that sales to pay debts be made at public auction. Point 16 is overruled. The probate court on March 3, 1947, ordered that the property in question "be sold by (the administrator) * * * at private sale for cash, and that no notice of such sale shall be required, and that said tracts be sold separately at Beaumont * * *." Sale was made accordingly. The probate court had authority under Articles 3572 and 3557, R.S.1925, to order a private sale; and the evidence supports the probate court's conclusion to sell at private sale rather than public auction. There was evidence that probate sales were generally made at private sale, and that public sales did not attract bidders. The lawyer for the administrator, and the lawyers for claimants with whom he discussed the procedure to be followed, were also influenced by a desire to sell as little of the estate as possible and by the belief that the method adopted, discussed hereinafter under Point 5, which involved a sale at private sale, was more likely to accomplish this end than a public sale. Under Article 3582, R.S.1925, notice of sale was not a prerequisite to a private sale. LeFors v. LeFors, Tex.Civ.App., 41 S.W.2d 517.

■■■■ Points 5, 19 and 28 assign as error this, that before the application for authority to sell was ever filed, the administrator had made contracts with his several vendees to sell to them the properties which they bought, and that the probate judge had also concurred in this procedure. These contracts, plaintiffs say, were contrary to public policy and therefore void, and they say further that as a consequence, all things done subsequently, that is, the order of sale, the sale, and the confirmation of the sale should be set aside because all were done to carry out and perform these void contracts.

Plaintiffs argue in support of this contention that no necessity for the sale existed and that the sales prices were not fair, but these arguments have been discussed and overruled, as have the arguments that a private sale was unauthorized and that no notice of sale was given.

The special issues submitted to the jury have some relevance to these points of er-

ror. Under Issues 1, 3, 5, 7, and 9, the jury found that a preponderance of the evidence did not show that the prices paid for the tracts of land which are involved in this proceeding were so inadequate as to shock the conscience; and under Special Issue 10 they found that a necessity for the sale ("a strong or urgent reason") existed at and before March 10, 1947. This date was the date of the order confirming the sales and of the various deeds made by the administrator to the purchasers of said properties.

No other special issues concerning any element of the matters assigned in Points 5, 19 and 28 were submitted to the jury and we do not have before us any complaint concerning the form of the trial court's charge.

The administrator's application to the probate court for authority to sell was filed on February 19, 1947. This application listed and described nine tracts of land to be sold; five of these, namely, those sold to Serafino, to Jef Chaison Townsite Company, and to Morris are involved in this appeal. On March 3, 1947 the county court ordered these tracts to be sold separately, for cash, at private sale, and dispensed with notice of the sale. On the day following, March 4th, the administrator reported a sale of each of these nine tracts at private sale on that day. On March 10, 1947 these sales were confirmed, and on the same date, as we have stated, the administrator made deeds to the purchasers, conveying to them the tracts which they had bought.

The purchasers of the five tracts which are involved in this proceeding had bid for the property, and their bids had been accepted and written agreements had been made between them and the administrator before the order of sale was passed; and at least four of these agreements had been made before application for authority to sell had been filed. It was a question of fact whether the contract concerning the other tract was made before or after this application was filed. These agreements and sales were made as a consequence of the matters now to be stated.

In 1946 tax suits against the administrator by the City of Beaumont and by the State and County were pending, and officials of the City were insisting that the taxes levied by the City be paid. Delinquent taxes collectible by the State and County were being collected by a person acting under contract so to do, and this special collector wanted these taxes to be paid, too, although he seems to have been less insistent than the officials of the City. The total indebtedness for taxes has been mentioned; it was about $30,000. The estate owned 22 pieces of land, all in Jefferson County where the estate was being administered and most of it in the City of Beaumont. Most of these tracts were improved, and the total value of the 22 tracts was much larger than the indebtedness for taxes, so that only a part of it had to be sold to pay this debt. However, it was necessary, in fact and in law, to sell some of these tracts if the taxes were to be paid; and to guide him in selecting properties to be sold and in making sales, the administrator employed one Stone to appraise these properties and to report his findings to the administrator. This appraisal has been discussed. On the proof, the administrator was justified in supposing Stone competent and reliable, and the trial court did not err in admitting into proof his opinions concerning the values of the various properties of the estate. Stone made his appraisal during December, 1946, and the first part of January, 1947. His report is dated January 16, 1947 and must have been delivered to the administrator's lawyer on or about that date. This report described in detail the 22 tracts of land and the improvements thereon, and separately appraised the land and the improvements thereon and also stated the total value of each tract. Stone appraised the 22 tracts at a total value of $76,865, twice the amount of the indebtedness for taxes.

The administrator's conclusions as to how the sale should be made and his selection of the properties to be sold were determined upon in cooperation with such lawyers as were known to be representing persons claiming the estate, and these lawyers acting for their clients, who numbered at least some of the present plaintiffs, approved his method of procedure and his conduct in ef-

fecting the sales. In these matters, the administrator was himself represented by a lawyer, who acted in his behalf and who actually did most of the work; but the administrator was informed of what was done and the things done were done by virtue of his approval and authority. There were three lawyers representing claimants of the estate. One represented Ethel Melton, who claimed to be the decedent's common law wife and thus entitled to nearly all of the estate. The other two lawyers represented heirs of the decedent, and were contesting Ethel Melton's claim. Neither of these two lawyers resided in the county where the estate was being administered, one residing in Crockett and the other in Lufkin; and the lawyer residing in Lufkin had employed a firm of lawyers who did reside in the county to assist him in representing his clients. The lawyer residing in Crockett also had a resident lawyer associated with him, but this associate apparently took part in none of the conferences to which we shall refer. Both lawyers for heirs were kept informed of what was done, and it may be inferred that both approved the procedure followed. The lawyer residing in Crockett participated in one of the conferences, as hereinafter mentioned.

At a conference on January 8, 1947 the administrator's lawyer submitted to these other lawyers, that is, the one representing Ethel Melton, the lawyer residing at Crockett, and the resident lawyer employed to assist the lawyer residing at Lufkin, and he procured their agreement, to the procedure which was actually followed in making the sales. The properties to be sold and the bids to be accepted were determined upon at two later conferences between the lawyers for the administrator, Ethel Melton, and the resident lawyer employed to assist the Lufkin lawyer. There seem to have been other conversations between all of these various lawyers, but these conversations need not be considered.

The procedure adopted for selling the properties involved sales at private sale, and these sales were effected as follows: A list of persons and firms who might be willing to buy the properties was prepared by the administrator's lawyer, with the assistance of the appraiser Stone, who had been engaged in the real estate business in Beaumont for many years, and with some assistance from the resident lawyers with whom he conferred. To each of the persons and firms thus selected, the administrator's lawyer wrote a letter, dated January 10, 1947, informing said persons of the administrator's intention to sell a part of the estate, enclosing some information about the 22 tracts appraised by Stone, and enclosing a form for making bids for these tracts and, in effect, requesting bids. In this letter it was stated that bidding would close at 12 o'clock noon on January 20, 1947, and that the administrator reserved the right to reject any and all bids. The letter did not state when the administrator would act on bids made, but it implied that this would be done prior to January 23rd, for it was stated that upon the administrator's acceptance of the bid, a cashier's or certified check for the price, payable to the administrator, should be placed in escrow with a named bank on or before January 23rd "with a proper escrow agreement, awaiting procural of the final court order, and upon procural thereof the sale will be immediately closed."

The administrator's lawyer named 36 persons and firms to whom he sent this notice; and he testified as following concerning these persons: A. Well, some of them are in the real estate business, some in the real estate and insurance business, some of them —they are in various businesses. Some have rental property, more or less as a side line. It is a list I compiled, with Mr. Stone's assistance, and with the attorneys, to try to get it out to people we thought would be interested in this sale that was going to be held." According to a stipulation made, he must also have sent this notice to the defendant and purchaser Morris. In addition to these letters, notice of the proposed sale was given prior to the sale at a meeting of the Beaumont Real Estate Board, a group of persons engaged in selling real estate. The administrator's lawyer testified that bids were received from three persons to whom he had not sent the letter described above.

All of the purchasers from the administrator who are parties to this appeal were persons to whom these notices were sent by the administrator's lawyer; and this is also true of the purchasers from the administrator who are parties to the branch of the cause severed from the part now on appeal, excepting Broadus who bought in association with Sanders.

The statement in the letter giving notice of the proposed sale that bidding would be closed on January 20th was not adhered to; bids were made and accepted after that date. This was true of tract 3, bought by Morris; and also of two tracts bought by Sanders and Broadus.

Bids for each of the 22 tracts were returned to the administrator's lawyer; and on January 21, 1947, or about that date, this lawyer and two others, the one representing Ethel Melton and the resident lawyer employed to assist the lawyer residing in Lufkin tentatively selected the properties which were to be sold. The other non-resident lawyer for heirs of the decedent, and his Beaumont associate, were also invited to attend this conference but neither did so. At this conference these persons had before them the report of appraiser Stone, hereinbefore mentioned, and the selection of the tracts to be sold was guided by these factors: (1) How the bids made for a particular tract compared with the appraised value of that tract; (2) how much the income in rentals would be reduced if the particular tract were sold; and (3) the condition of the improvements on the particular tract. The object kept in mind was to sell as little of the estate as possible, and to reduce as little as possible the rentals of the estate, which constituted the income of the estate, and further, to sell the properties which were in the worst condition.

Later, a bidder, Steinman, withdrew his bids and this resulted in some changes in the list of items to be sold which were agreed upon at another conference between the lawyers who participated in the conferences of January 21st. The items of property thus selected were submitted to the administrator who approved the selection thus made.

We have mentioned the factors which guided the selection of properties to be sold. The weight given the value set by the appraiser is shown by Morris' purchase of tract 3, and, of course, by the bids which were accepted. Morris made a bid for tract 2 in response to the invitation for bids but did not then bid for tract 3. However, after the time stated in the notice for receiving bids had passed, he made a bid for tract 3. His bid was $2,800, the value set by Stone; the next highest bid made for this tract was that of $2,018 by the Jef Chaison Townsite Company. All except one of the bids finally accepted either equalled or exceeded the value appraised by Stone. The only bid which was less than the value set by Stone was Coffin's bid of $500 for tract 9. Stone appraised this tract at $650, and administrator's lawyer explained, as follows, why Coffin's bid was accepted. "A. Yes, sir; that was vacant property, no income from it, and we needed, after the attorneys and I had discussed the various tracts, we still needed a little more money, and we put that tract in to get the amount of money we needed for the payment of our debts. Q. In other words, it was one that would dispose of the least amount of property in order to bring up the amount of money you computed you needed, to settle the debts and charges against the estate? A. That's right, and we didn't surrender any income, except, I think, a pasture lease on it. It didn't amount to anything as income." The weight given the reduction in rentals caused by sales of property is shown by the transaction with Steinman, who had bid for several tracts. Concerning this incident, the administrator's lawyer testified: "A. I think two that Steinman bid on, they were sold. When he didn't get a block in the North Addition that had some commercial properties on it, pretty high income, when I wouldn't agree to selling that block to him, he said just to disregard his bids on all of it."

The administrator eventually accepted bids on the nine tracts (of the 22 owned by the estate) which were actually sold, and with each person whose bid was accepted (or at least with such of those per-

sons as are parties to this appeal) made an agreement in writing. These agreements were similar, and may be summarized as follows: Each purported to be made between the administrator as "seller" and the person whose bid had been accepted, referred to as "purchaser". In a preliminary paragraph it was stated that "subject to the approval of the county court * * * seller desires to accept (the) bid and to sell (the particular property) to purchaser under an order of said county court authorizing and directing such sale, upon the terms and conditions hereinafter stated, and purchaser desiring to complete such purchase upon said terms, it is mutually agreed as follows." Thus appear in order a description of the property, a provision for payment by a certified or a cashier's check, a statement of the cash price, and a provision concerning abstracts of title. It next provided that a copy of the agreement and a certified or a cashier's check should be placed in escrow "pending procural of an order from the county court * * * authorizing the sale of the above described real estate to purchaser for the consideration * * * stated." In the next paragraph it was stated that the property was being sold to pay delinquent taxes levied by the City of Beaumont, the State of Texas and the County of Jefferson, and the administrator promised to use the consideration paid by the purchaser to discharge these taxes.

This agreement was signed by the administrator and by the person whose bid was accepted.

Following these signatures was an agreement by the bank selected as escrow agent, acknowledging receipt of a copy of the agreement between the administrator and the bidder, and of the bidder's cashier's check for the purchase price.

All of the things hereinbefore mentioned were done and completed before the order of the sale was passed; and except in the case of tract 3, before the administrator had applied for authority to sell. The escrow agreement concerning tract 3 was made on February 25th, between the date when the application for authority to sell was filed and the date of the order of sale; and it was a question of fact whether the administrator and Morris signed the agreement concerning tract 3 before or after the application was filed.

To each of the persons whose bid had been accepted, the property for which he had bid was sold to him by the administrator on March 4th, the day following the date of the order of sale, for the price stipulated in the particular contract, and this sale was confirmed by the order of March 10, 1947.

It seems to us that the most which can be said in behalf of plaintiffs is that the agreements of the administrator had a potential (as distinguished from an actual) tendency to cause the administrator, if they did not purport to bind him, to attempt to procure the county court's approval of sale to the bidder for the price stated in the agreement with the bidder. The agreements, although conditioned upon the approval of the county court, do not expressly provide that the administrator will continue to offer the property for sale and do not expressly provide that the administrator may accept a higher bid. Further, it is to be inferred that after the administrator made an agreement with a bidder, he made no further effort to sell the tract covered by his agreement.

However, it is apparent from the testimony of the County Judge that he would not have confirmed any sale if a bid higher than the one accepted by the administrator had actually been made after these agreements were signed, and it is the uncontradicted testimony of the administrator's lawyer that the administrator desired to and would have accepted a higher bid if he had received any for any item of property covered by one of his agreements.

Further, the bids finally accepted were in every instance the highest ever made for the particular item of property. According to the administrator's lawyer, only five of these bids were returned in response to the invitation to bid; the other four bids were made afterwards, and at least some of them were made in response to efforts to procure bids higher than those pending before the administrator. One or

these four bids was that of Morris for tract 3, which has been mentioned. The other three were made by Sanders and Broadus who are not parties to this appeal. On two tracts bid by Sanders and Broadus, Steinman had made the highest bid. Sanders and Broadus had also bid for these items and on the withdrawal of Steinman's bid were persuaded by the administrator's lawyer to raise their bids, and they did so, by substantial sums, to Steinman's figure.

It may also be said that the circumstances in proof do not tend to prove that if additional efforts to sell the properties for which bids had been accepted had been made, after the acceptance of those bids, those efforts would have procured offers higher than the bids accepted. Rather, as we view the record, the proof tends to show the contrary. At least in the case of the four bids which were not made in response to the invitation to bid, there cannot have been much time between the administrator's acceptance of these bids and the date of the order of sale.

The administrator's lawyer also had some discussion with the county judge concerning the sales of the properties. There seem to have been two of these conferences. The first occurred about the time when the invitation to bid was sent out; and on this occasion the procedure adopted was explained to the county judge and it was approved by him. Later, after a number of bids had been received, the second conference was held; and at this time the bids received were discussed and the bids to be accepted, or at least some of them, were approved. It is not clear to us from the proof whether this second conference occurred before or after the order of sale was made. However, such approval and concurrence as was given by the county judge before the order of sale was made was only tentative; it was clearly understood that the highest bid which actually came into the administrator's hands would be accepted, and we are satisfied that nothing was done or said and no agreement was arrived at which either caused or tended in fact to cause any injury to the plaintiffs.

Of course, all of the purchasers from the administrator had notice of the matters that were charged against them, and doubtless this is true of W. F. Weed, who purchased tract 5 from the Jef Chaison Townsite Company after the Townsite Company had bought it from the administrator. Mr. Weed had an interest in the bid which T. E. Moor had made for this tract in response to the administrator's invitation to bid. Of Morris' vendees, only one, Harrison, is a party to the proceeding; and the proof does not show whether he had notice of the facts or not.

With this statement of proof, the evidence summarized under Points 21 to 25, inclusive, should also be kept in mind.

Points 5, 19 and 28 are overruled upon the following grounds: (1) The purchasers' titles rest upon the order of the probate court confirming the sales, not upon the administrator's agreements; no one is claiming any right under those agreements and the question before us is whether the county court's order confirming the sales ought to be set aside, and with it the sales thereby confirmed, not whether the agreements were valid. The agreements are immaterial except, perhaps, as a circumstance in relation to the order confirming the sales. (2) No fraud was committed, nor was there any effort made to stifle competition or to depress the prices. Instead, the administrator endeavored to obtain the highest prices possible and to reduce the value and the income of the estate as little as the circumstances would permit. According to the proof made, his method of procedure was an apt one to attain those ends. (3) The circumstances which we have listed under these points and under Points 21 to 25, inclusive, tend to prove that a fair price was actually paid for the property and to show that a substantially better price would not have been obtained by further efforts after the administrator accepted bids for the properties sold. It is true that the opinions of the witnesses who purported to be familiar with the market values of the properties differed greatly, the testimony of those called by the defendants tending

to prove that the sales prices were fair and the testimony of persons called by plaintiffs tending to prove that the sales prices were unfair. However, we think that the weight of the evidence here is in favor of the defendants because the only one of the expert witnesses (other than the purchasers themselves) who actually knew what the condition of the property was when it was sold was the appraiser Stone; and under the verdict of the jury the question, whether the sales prices were fair or unfair has been resolved in favor of the defendants, and we shall have to dispose of this appeal on the assumption that the prices paid were actually fair. (4) It is apparent that a full disclosure has been made concerning the sales of the properties and the means and methods used to effect those sales.

With these conclusions before us, we can perceive no reason why the order of confirmation should be set aside. It may be said that the procedure followed by the administrator was not contemplated by the statutes; but it was not illegal in the sense that it violated any law expressly prohibiting it. The probate court was not committed to the approval of any sale. If the administrator's written agreements violated some rule of public policy because these agreements had a potential tendency to cause or because these agreements actually did cause the administrator to terminate his efforts to sell the properties covered by these agreements before he was ever authorized to sell the properties, or because such agreements tended to govern and control the administrator's conduct after the order of sale was made, it surely must be said that the ultimate end of this public policy was a fair price for properties sold and the small possible reduction of the estate; and it seems to us that these objects were accomplished here. Plaintiffs' arguments amount to this, that people were committed and everything to be done was done and over with before the administrator was authorized to make a sale. The probate court, as we have stated, was not committed; but it may also be said in response to plaintiffs' argument that in this particular case the method under

attack actually proved to be efficient and fair. The agreements of the administrator thus seem wholly immaterial; the validity of these agreements is not directly in issue because no rights are claimed under them, and the agreements are not circumstances to be considered in relation to the order confirming the sale because they actually did not result in any harm to the estate. On the proof before us, there cannot have been anything wrong in the administrator's effort to determine in advance whether the properties could be sold and what prices could be expected for them.

■ In a certiorari proceeding, such as this is, an order confirming an administrator's sale will not be set aside unless the irregularities charged actually resulted in substantial injury to the estate. See: Comstock v. Lomax, Tex.Civ.App., 135 S.W. 185, at page 187; Lomax v. Comstock, 50 Tex.Civ.App. 340, 110 S.W. 762; Kendrick v. Wheeler, 85 Tex. 247, at page 253, 20 S.W. 44; Fitzwilliams v. Davie, 18 Tex.Civ.App. 81, 43 S.W. 840, at pages 842–843; Schwind v. Goodman, Tex.Com. App., 221 S.W. 579; Thomas v. Pure Oil Co., Tex.Civ.App., 297 S.W. 776; George v. First National Bank of Tulia, Tex.Civ. App., 67 S.W.2d 324; Pure Oil Co., v. Clark, Tex.Com.App., 56 S.W.2d 853 (Hdn. 3).

■ Plaintiffs' other points of error have been considered but are overruled. Point 15 has not been briefed. Point 27 has directed our attention to a matter of jurisdiction which we have considered, although it has not been raised. The trial court, acting presumably under the cross action of the purchasers of the properties and their vendees, declared the deeds to the purchasers and the deeds from two of the purchasers to Weed and Harrison to be valid and effective. On certiorari, the district court has jurisdiction to set aside the administrator's deed to the purchaser from him as well as jurisdiction to set aside the orders of the probate court on which the deed depends. McDonald v. Edwards, 137 Tex. 423, 153 S.W.2d 567. Thus, the trial court's declaration that the deeds from the administrator to the pur-

chasers from him were valid is nothing but a statement in affirmative form instead of in negative form denying the plaintiffs' prayer that the administrator's deeds be set aside. Doubtless, if any greater effect be given to this part of the judgment, the trial court has exceeded its jurisdiction, as it has in declaring that the deeds from two of the purchasers to their vendees, Weed and Harrison, were also valid. However, the declaration concerning the deeds to Weed and Harrison are immaterial to plaintiffs, because the sales to the vendors of these two parties has been upheld. The matter of title remains one to be determined under the original jurisdiction of the district court as distinguished from the jurisdiction of that court on certiorari to the county court.

These comments adjudicate all of plaintiffs' points of error. All of the points having been overruled, the judgment of the trial court is affirmed.